## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

JUNE MEDICAL SERVICES LLC d/b/a HOPE
MEDICAL GROUP FOR WOMEN, on behalf of
its patients, physicians, and staff; BOSSIER
CITY MEDICAL SUITE, on behalf of its
patients, physicians, and staff; JOHN DOE 1,
M.D.; JOHN DOE 2, M.D., and JOHN DOE 3,
M.D.,

|  |  |
|---|---|
| | Case No. |

                  Plaintiffs,

      v.

REBEKAH GEE, in her official capacity as
Secretary of the Louisiana Department of Health
and Hospitals; JEFF LANDRY, in his official
capacity as Attorney General of Louisiana; J.
MICHAEL BURDINE, MD, in his official
capacity as President of the Louisiana State Board
of Medical Examiners; JAMES E. STEWART,
SR., in his official capacity as District Attorney
for Caddo Parish; and J. SCHUYLER MARVIN,
in his official capacity as District Attorney for
Bossier and Webster Parishes,

                  Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiffs June Medical Services LLC (d/b/a Hope Medical Group for

Women) ("Hope"), and Bossier City Medical Suite ("Bossier"), on behalf of their patients,

physicians and staff (collectively, "Clinic Plaintiffs"), JOHN DOE 1, M.D., on behalf of

himself and his patients, JOHN DOE 2, M.D., on behalf of himself and his patients, and

JOHN DOE 3, M.D., on behalf of himself and his patients (together with the Clinic Plaintiffs,

"Plaintiffs"), by and through their undersigned attorneys, and for their Complaint against

Defendants Jeff Landry, in his official capacity as Attorney General of Louisiana, Rebekah Gee in her official capacity as Secretary of the Louisiana Department of Health and Hospitals ("DHH"), J. Michael Burdine, MD, in his official capacity as President of the Louisiana State Board of Medical Examiners ("LSBME"), James E. Stewart, Sr., in his official capacity as District Attorney for Caddo Parish, J. Schuyler Marvin, in his official capacity as District Attorney for Bossier and Webster Parishes, state as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for declaratory and injunctive relief brought under the United States Constitution and 42 U.S.C. § 1983, to challenge the constitutionality of seven bills restricting abortion passed by the Louisiana Legislature during its 2016 Regular legislative session:  Louisiana House Bill 1081, Regular Session (2016) (Act 264), to be codified at La. Rev. Stat. § 40:1061.1.1 ("H.B. 1081") (attached hereto as Exhibit A); Louisiana House Bill 1019, Regular Session (2016) (Act 563), to be codified at La. Rev. Stat. § 40:1061.1.1 ("H.B. 1019") (attached hereto as Exhibit B); Louisiana House Bill 815, Regular Session (2016) (Act 593), to be codified at La. Rev. Stat. § 40:1061.25 ("H.B. 815") (attached hereto as Exhibit C); Louisiana Senate Bill 33, Regular Session (2016) (Act 196), to be codified at La. Rev. Stat. § 14:87.3 ("S.B. 33") (attached hereto as Exhibit D); Louisiana House Bill 386, Regular Session (2016) (Act 97), to be codified at La. Rev. Stat. §§ 40:1061.10(D)(2), 40:1061.16(B), 40:1061.17(B)(3), (4)(b), (5)-(6), and (8), and 40:1061.18(D) ("H.B. 386") (attached hereto as Exhibit E); Louisiana House Bill 488, Regular Session (2016) (Act 98), to be codified at La. Rev. Stat. § 40:1061.10(A)(1) ("H.B. 488") (attached hereto as Exhibit F); and, Louisiana House Bill 606, Regular Session (2016) (Act 304), to be codified at La. Rev. Stat. §§ 40:1061.6(A) and 36:21 ("H.B. 606") (attached hereto as Exhibit G) (collectively,

the "2016 Acts").  All of the 2016 Acts, except H.B. 1019 and H.B. 606, which had immediate effective dates, are scheduled to take effect on August 1, 2016.

2.      H.B. 1019 requires DHH to produce an "informational document" regarding "fetal genetic abnormality" and "children born with disabilities," and imposes criminal penalties on any physician who performs an abortion without giving the patient this document in advance. The Legislature included an immediate effective date in this bill, denying DHH any time to produce the document before the law took effect, thus throwing into doubt the ability to perform abortion in Louisiana, until such time, if any, as DHH produces the document. Additionally, H.B. 1019 prohibits women from obtaining a pre-viability abortion after twenty weeks post-fertilization, for the sole reason that the fetus has been diagnosed with an actual or potential "genetic abnormality," as defined by the statute, with limited exceptions.

3.      H.B. 1081 prohibits the performance of dilation and evacuation (D&E) procedures without demise, thus denying Louisiana women seeking second trimester abortions of a safe and commonly used method, and requiring them to undergo additional risky and invasive proc which are  effectively depriving women of access to abortion in Louisiana after about 15 weeks from their last menstrual period ("lmp").

4.      H.B. 815 requires cremation or burial for embryonic or fetal tissue following an abortion, with limited exceptions.  Among other things, H.B. 815 bans medication abortion, a commonly used method of abortion in the first trimester, and the only one allowing a woman to pass a pregnancy at home, because an embryo miscarried at home through medication abortion cannot in practice be buried or cremated.

5.      S.B. 33 imposes a term of decades of imprisonment at hard labor for receiving reimbursement for the costs of collecting and storing tissue from abortions, but not miscarriages, for medical research.

6.      H.B. 386 prohibits women from granting their informed consent to abortion for three days after being given all the information necessary to do so, thus delaying their abortions.

7.      H.B. 488 limits the pool of physicians eligible to perform abortions solely to those board-certified in family medicine or obstetrics and gynecology, or to residency trainees under their supervision.

8.      H.B. 606 prohibits any state or local government agency from entering into any funding agreement with any entity that performs abortions and with any third-party entities that contract with any entity that performs abortions, with very limited exceptions.

9.      These seven new restrictions individually, and cumulatively with one another, threaten irreparable injury to the Plaintiffs and their patients, including, but not limited to, by depriving Plaintiffs' patients' of their constitutional right to abortion.

10.     Plaintiffs seek declaratory and injunctive relief from these constitutional deprivations.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4).

12.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district, and the majority of Defendants, who are sued in their official capacities, carry out their official duties at offices located in this district.

## PARTIES

14.     Plaintiffs are 2 of only 4 clinics that provide abortions in the entire state of Louisiana, and the physicians that work at those 2 clinics.

15.     Hope is a women's reproductive health clinic located in Shreveport, Louisiana, and has been providing care since 1980. Hope is a member of the National Abortion Federation, and is licensed and inspected annually by DHH. In addition to abortion services, Hope provides contraception, pregnancy testing and counseling, adoption referrals, and community and health professional education programs. Hope sues on its own behalf and on behalf of its physicians, staff and patients.

16.     Bossier is a women's reproductive health clinic that has been operating in Bossier City since 1980, and provides both first and second trimester abortion services. In addition to abortion services, Bossier City offers pregnancy tests, ultrasounds, and pap smears to returning patients. Bossier City sues on its own behalf and on behalf of its physicians, staff and patients.

17.     Plaintiff Dr. John Doe 1, M.D., is a board-certified physician in Family Medicine and Addiction Medicine with over 8 years of experience. He is one of two clinic physicians at Hope providing women's health services to the clinic's patients, including providing abortion services. Plaintiff Doe 1 sues on his own behalf and on behalf of his patients.

18.     Plaintiff Dr. John Doe 2, M.D., is a board-certified obstetrician-gynecologist ("ob-gyn") with over 34 years of experience in women's health.  He is the only clinic physician at Bossier who provides abortion services.  Dr. Doe 2 provides abortions through 21 weeks, 6 days lmp.  He provides D&E procedures beginning at about 16 weeks lmp, and sometimes as early as about 15 weeks.  Plaintiff Doe 2 sues on his own behalf and on behalf of his patients.

19.     Plaintiff Dr. John Doe 3, M.D., is a board-certified ob-gyn with over thirty-five years of experience in women's health.  He is one of two clinic physicians at Hope providing abortion services.  Plaintiff Dr. John Doe 3 sues on his own behalf and on behalf of his patients.

### DEFENDANTS

20.     Jeff Landry is the Attorney General of the state of Louisiana.  As stated in his letter sent on June 8, 2016, to every Louisiana abortion clinic, including Plaintiff Clinics, as Attorney General, Defendant Landry has the authority to enforce laws restricting abortion.  He is sued in his official capacity.

21.     Rebekah Gee is the Secretary of the Louisiana Department of Health and Hospitals.  DHH is tasked with the authority to enforce H.B. 488.  Furthermore, the Department of Health and Hospitals has the authority to revoke or deny clinics' licenses for violation of any other law.  La. Rev. Stat. § 40:2175.6.  She is being sued in her official capacity.

22.     J. Michael Burdine, MD, is the President of the Louisiana State Board of Medical Examiners (the "Board").  The Board has the authority to take disciplinary action against any physician.  La. Rev. Stat. § 37:1263 et seq.  Also, H.B. 1081 and H.B. 1019 expressly provide for enforcement by the Board pursuant to La. Rev. Stat. § 37:1263 *et seq.*  Furthermore, H.B. 815, H.B. 386, and H.B. 488 provide for penalties by reference to La.

Rev. Stat. § 40:1061.29, which in turn provides for enforcement by the Board under La. Rev. Stat. § 37:1263 *et seq.* Dr. Burdine is being sued in his official capacity.

23.     James E. Stewart, Sr., and J. Schuyler Marvin are District Attorneys whose jurisdictions encompass, respectively, Shreveport and Bossier City. All the 2016 Acts, except for H.B. 815, expressly or by reference to La. Rev. Stat. § 40:1061.29 provide for criminal penalties including fines and imprisonment, and are thus enforceable by Louisiana district attorneys. Mr. Stewart and Mr. Marvin are being sued in their official capacities.

## FACTUAL ALLEGATIONS

### *Abortion methods*

24.     In the first trimester of pregnancy, abortions are performed using medical or surgical means. Medication abortion involves the ingestion of one medication at the clinic, followed by the ingestion of a second medication at home. The pregnancy is passed at home. The FDA has approved drug labeling for this method of abortion through 70 days lmp. Surgical abortion is performed using a suction device to empty the uterus, and is sometimes called suction curettage. In general, prior to any surgical abortion at any stage of pregnancy, physicians dilate the woman's cervix to allow passage of instruments.

25.     The availability of both methods of abortion to women in early pregnancy is an advance in medical care. It allows women two options to suit their particular circumstances. For some women, one of the methods may be medically indicated. In particular, women with certain anatomical or medical conditions complicating surgical abortion, women with a low tolerance for the more invasive nature of surgical abortion, and women living with domestic violence who can disguise a medication abortion as a miscarriage, if necessary, benefit from the availability of medication abortion.

26.     Starting at approximately 15 weeks lmp, or occasionally even earlier, physicians performing abortions may use forceps or other instruments to remove the products of conception (including the fetus, placenta, and umbilical cord) from the uterus, often in combination with suction.  Usually, disarticulation of the fetus occurs as the physician brings fetal parts through the cervix.  This procedure is known as a dilation and evacuation or D&E procedure.  Because of its impressive safety record, D&Es are the most commonly used second-trimester method of abortion, accounting for the vast majority of second trimester abortions nationwide.

27.     Legal abortions in the United States are provided by health care providers with a variety of credentials, including specialist physicians, primary care physicians, certified nurse midwives, nurse practitioners, and physician assistants.  Suction and medication abortion—which together encompass the vast majority of abortions performed in the United States, and in Louisiana—may safely be provided by a properly trained healthcare provider with any of these credentials.  There is no medical basis for limiting the performance of first trimester abortions to board-certified obstetricians/gynecologists and family physicians.

28.     Obtaining and maintaining board certification in family medicine requires neither any training in abortion nor any competence in performing abortion.  Family medicine residency programs are not required to offer their participants any abortion training.

29.     Defendant LSBME has issued an Advisory Opinion stating that, in addition to ob/gyns, a physician who has done any accredited residency and has "received training in the performance of surgical abortions or other gynecologic surgery," is "deemed to have sufficient training" to perform first-trimester surgical abortion.  The opinion clarifies that "a physician may be considered to have sufficient training to perform first-trimester surgical

8

abortions provided he or she has completed a[] . . . residency in one of the internal medicine specialties, general surgery or one of the surgical specialties, or family medicine, and has obtained appropriate educational and clinical training in performing abortions, where he or she has demonstrated the knowledge, skills, and ability required to perform the procedures."

30.     The opinion also states, "a physician who performs medical abortions need not possess competence in preforming the procedures of surgical abortion . . . ."

31.     The opinion does not mention board certification at all.

32.     The opinion concludes, "The Board recognizes that there may be instances where physicians would be deemed competent to perform first trimester medical or surgical abortion, even though they do not have the education, training, experience, and credentials described above."

## *Delaying abortion care*

33.     Abortion is a very safe procedure.  Approximately one in three women in the United States will have an abortion over the course of her lifetime.

34.     There is no health benefit to a woman in preventing her from granting informed consent to an abortion, after she has visited a clinic, met with a doctor, and been given all the information necessary to grant informed consent, until after a three-day period has passed.

35.     Legal, pre-viability abortion is safe at any point in pregnancy, but delayed abortion care is associated with health risks.  The risks of complications, and the risk of abortion failure, increase with increasing gestational age.  Additionally, every day a woman remains pregnant, she incurs the risks of complications of pregnancy, and endures pregnancy symptoms.  The complexity and cost of abortion also increase with increased gestational age.

36.     Requiring women to wait for abortions that they have already decided to have imposes mental hardship and suffering, sorrow, and nervousness for some women.

37.     There is also no benefit to a woman's decisionmaking in preventing her from granting her informed consent to an abortion, after she has visited a clinic, met with a doctor, and been given all the information necessary to grant informed consent, until after a three-day period has passed.  In particular, such a wait does not help women become more certain about their decision.

38.     It is also a violation of medical ethics for a physician to withhold time-sensitive medical care from a patient for no medical reason.

## THE INDIVIDUAL ACTS AND THEIR IMPACT

### *H.B. 1081*

39.     H.B. 1081 prohibits the performance on a living fetus of an abortion procedure described in the act as "dismemberment abortion."  Although "dismemberment abortion" is not a medical term, the bill's definition makes clear that it prohibits a D&E.

40.     H.B. 1018 defines "dismemberment abortion" as a procedure done:

with the purpose of causing the death of an unborn child, to purposely dismember a living unborn child and extract him or her one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or a similar instrument that, through the convergence of two rigid levers, slices, crushes, or grasps a portion of the unborn child's body to cut or rip it off or apart.

41.     Procedures in which the physician uses only suction, without instruments such as those described in H.B. 1081, are not included in the ban.

42.     Any person who performs or attempts to perform an abortion procedure prohibited by H.B. 1081 is subject to imprisonment of up to two year and fines of up to one thousand dollars and "professional disciplinary action."

43. In addition, violation of H.B. 1081 is the "basis for a cause of action for civil damages and injuries and wrongful death . . . whether or not the unborn child was viable at the time the abortion was performed."

44. H.B 1081 includes an exception, allowing for otherwise-prohibited procedures "necessary to prevent serious health risk[s]," which are defined as "a condition that so complicates [a woman's] medical condition that it necessitates the abortion of her pregnancy to avert her death or to avert serious risk of substantial physical impairment of a major bodily function . . . ."

45. A physician charged with violating H.B. 1081 "may seek a hearing before the Louisiana State Board of Medical Examiners on whether the physician's conduct was necessary to save the life of the mother," with the Board's findings admissible at trial. By its own terms, this hearing procedure is thus only available to determine whether the D&E was necessary to save the patient's life, and not to prevent "serious health risk[s]."

46. Prior to 18 weeks lmp, it is not accepted medical practice to induce fetal demise (cause the death of the fetus) by any means prior to performing a D&E procedure, and there are virtually no studies addressing whether it would be safe to do so.

47. Some physicians, beginning around 18 to 20 weeks lmp, do induce fetal demise, based largely on their personal experience that it sometimes helps to shorten the abortion procedure. Dr. Doe 2 typically begins inducing demise at 19 weeks, 4 days lmp. Published research to date has not shown any improvement in safety of the abortion procedure itself from the addition of demise to the standard D&E procedure.

48. Physicians who induce demise, including Dr. Doe 2, typically use an injection of digoxin, a medication that is also used to treat certain heart conditions. The physician

administers the digoxin to the fetus using a needle that is inserted through the woman's abdomen (a transabdominal injection) or through her vagina (transvaginal injection). Digoxin is usually administered 1-2 days before the D&E procedure, in conjunction with beginning dilation.

49.     The injection procedure itself carries risks. Digoxin is not available for every patient because of medical contraindications and allergies. Currently, Dr. Doe 2 will still provide a patient with a D&E even if the digoxin injection is contraindicated, but under H.B. 1081 this would no longer be possible.

50.     There are no feasible alternatives to D&E. Induction of labor is not the standard of care for abortions and accounts for only about 2% of second trimester procedures. Induction procedures must be performed in a hospital and can require a hospital stay of two to three days. In addition to the expense associated with an inpatient versus an outpatient procedure, many hospitals restrict the circumstances under which abortions may be performed, and therefore would not make services available to most women. These barriers are in addition to the fact that induction subjects women to the pain, anxiety and health risks of labor, compared to a brief outpatient procedure.

51.     Additionally, although Hope does not offer abortions after 16 weeks, 6 days, and generally uses only suction, Hope's only physician providing abortion care during the first three weeks of the second trimester (known as Dr. John Doe 3, M.D., in this action) may, for any given patient beginning at about 15 weeks, need to utilize instruments in addition to suction in order to safely remove the fetus, if suction alone does not complete the abortion. This risks violating H.B. 1081. Dr. Doe 3 cannot predict prior to beginning a procedure if

such actions will be necessary. He thus fears criminal prosecution and civil liability for violating H.B. 1081 for all procedures he performs beginning at approximately 15 weeks.

52. In order to avoid the penalties imposed by H.B. 1081 and continue providing abortions at about 15 weeks or later, Plaintiffs must induce demise for each patient, and thereby subject her to a procedure that is more complex, riskier and—prior to 18 weeks— unstudied and not the standard of care, and which includes an invasive injection that involves pain, bodily intrusion, and additional health risks, with no established medical benefits.

53. It is unethical for a physician to perform untested and risky procedures on patients that would have no medical benefit.

54. The Louisiana Legislature passed H.B. 1081 even though the United States Supreme Court has repeatedly held that states are prohibited from banning the most common second trimester abortion procedure—including, in *Stenberg v. Carhart*, 530 U.S. 914 (2000), specifically holding that states may not ban D&E.

55. No other Louisiana law forces any person to undergo a medically unnecessary procedure in order to obtain the health care he or she needs. Only women seeking abortions are singled out in this way. Requiring women to obtain a medically unnecessary procedure to meet the requirements of H.B. 1081 furthers no legitimate state interest.

56. Similarly, no other Louisiana law requires a physician to subject a patient to an unnecessary procedure that he or she does not believe is in her best interests before providing legal health care. Requiring physicians to make the choice between providing D&E abortions according to their best medical judgment or deviating from that judgment in order to meet the requirements of H.B. 1081 furthers no legitimate state interest.

57.     H.B. 1019 prohibits the performance of an abortion at 22 weeks lmp or later "with knowledge that the pregnant woman is seeking the abortion solely because the unborn child has been diagnosed with either a genetic abnormality or a potential for a genetic abnormality."  It further provides:

"Genetic abnormality" means any defect, disease, or disorder that is inherited genetically.  The term includes, without limitation, any physical disfigurement, scoliosis, dwarfism, Down Syndrome, albinism, amelia, and any other type of physical, mental, or intellectual disability, abnormality, or disease.

The prohibition does not apply to pregnancies diagnosed as "medically futile," defined to mean that "in reasonable medical judgment, the unborn child has a profound and irremediable congenital or chromosomal anomaly that is incompatible with sustaining life after birth."

58.     H.B. 1019 thus criminalizes pre-viability abortion based solely on the reason the woman is seeking the abortion.

59.     H.B. 1019 also requires that a physician give *all* his or her abortion patients who are prior to 22 weeks lmp, "an informational document including resources, programs, and services for pregnant women who have a diagnosis of fetal genetic abnormality and resources, programs, and services for infants and children born with disabilities," with the sole exception of abortions intended to save the patient's life.  DHH "shall develop [the] informational document."

60.     Any person violating the provisions of H.B. 1019 is subject to imprisonment and fines, as well as "professional disciplinary action" and civil liability.

61.     H.B. 1019 took effect on June 17, 2016.  However, DHH has not to date written the "informational document" for which physicians are to be subject to imprisonment, fines, civil

liability, and professional discipline for not giving to their abortion patients. Thus, without an injunction, H.B. 1019 arguably bans all abortions in Louisiana until the informational document is created and made available to all physicians providing abortion in the state.

62.     The "informational document" about resources available for pregnant women "who have a diagnosis of fetal genetic abnormality," must be given to all abortion patients, regardless of the reason why the woman is seeking the abortion, even if the pregnancy is "medically futile." For the great majority of women seeking abortions, who have not had a diagnosis of fetal genetic abnormality, or whose pregnancy is medically futile, this information is irrelevant to their decision.

### *H.B. 815 and S.B. 33*

63.     H.B. 815 provides that a physician performing an abortion "shall insure" that the remains of the fetus or embryo "are disposed of by internment or cremation, in accordance with the provisions of R.S. 8:651 et seq." La. Rev. Stat. § 8:651 *et seq.* govern the disposition of "every dead body of a human being lying within this state."

64.     "Abortion" is not defined within H.B. 815, but is defined elsewhere in Chapter 40 of the Louisiana Revised Statutes to mean:  "the act of using or prescribing any instrument, medicine, drug, or other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child," not including miscarriage management or ectopic pregnancy treatment.  La. Rev. Stat. § 40:1061.9(1). H.B. 815 also provides that "[n]othing in this Section shall be construed to alter generally accepted medical standards . . . ."

65.     H.B. 815 does not prohibit "final disposition in accordance with state law," or conduct that is undertaken for "the purpose of providing knowledge" "solely to the mother, such as for diagnostic or pathological purposes," or "to law enforcement officers, such as the case of an autopsy following feticide."

66.     The penalty for violating H.B. 815 includes "professional disciplinary action," as set forth in La. Rev. Stat. § 40:1061.29.

67.     H.B. 815's requirement that fetal remains following abortion be either buried or cremated is an effective ban on first trimester medication abortion. During a medication abortion, the products of conception are passed at home and collected and disposed of by the woman in the same or similar manner as that used during menstruation. Thus, the physician cannot insure that the fetal remains are disposed of by burial or cremation, and therefore cannot provide a medication abortion and comply with H.B. 815.

68.     H.B. 815 imposes embryonic and fetal tissue disposition requirements on physicians performing an abortion—but not on physicians providing miscarriage management, nor on women experiencing miscarriage.

69.     S.B. 33 prohibits the "sale, receipt, or transport of fetal organs and body parts," including by donation, which are obtained through abortion. This includes parts as small as "a cell." S.B. 33 contains the same language with regards to disposition or the provision of tissue for pathological examination or law enforcement purposes as H.B. 815.

70.     The penalty for violating S.B. 33 is "a term of imprisonment at hard labor for not less than ten nor more than fifty years," and a fine of up to fifty thousand dollars.

71.     Both H.B. 815 and S.B. 33 prohibit women who choose abortion from consenting to the donation of their fetal tissue for scientific research, but do not impose the same prohibition on women who suffer miscarriage.

72.     H.B. 815 also sets forth legislative findings stating that allowing women who opt for abortion to donate fetal tissue "constitutes unethical undue influence and coercion, and amounts to incentive to actively participate in the killing of a living human being," and that allowing such donation is "a gross violation of ethical norms," distinct from such donation in the context of miscarriage, which the bill implies may be "ethical and proper." The legislative findings of H.B. 815 thus express the belief that women seeking abortions, unlike women experiencing a miscarriage, are incapable of making informed decisions about the disposition of fetal remains.

73.     This disparate treatment is underscored by a third bill related to fetal tissue enacted this year, H.B. 618, which requires any health facility where a miscarriage occurs to inform the patient of her right to arrange for and elect among "burial, cremation, or other disposition of the remains of a human fetus following fetal death." If the patient does not state a preference, "the fetal remains shall be disposed of in accordance with the rules and regulations promulgated by [DHH]." Thus, a woman is empowered to make her own choices after miscarriage, but denied from making them after abortion.

### _H.B. 386_

74.     H.B. 386 requires a woman to wait at least seventy-two hours after being given all the information necessary to grant her informed consent to an abortion before permitting her to grant that consent.

75.     Thus, women seeking abortion, uniquely among medical procedures, will be prevented from being able to grant informed consent for the procedure they seek for three days after becoming able to do so.  No other Louisiana law prohibits a competent adult from granting informed consent to any other medical procedure for any period of time, let alone three days.

76.     H.B. 386 thus treats pregnant women considering abortion as less competent than any other capable adult making any other medical decision.  This is an affront to the dignity and autonomy of women.

77.     Delays in obtaining abortion care, such as those imposed by H.B. 386, expose women to greater health risks associated with later abortions and longer pregnancies, and increase anxiety, suffering, and expense.

78.     H.B. 386 will also force doctors to violate tenets of medical ethics, by withholding care for no medical reason.

79.     Other Louisiana law limits the performance of abortion to before 22 weeks lmp.  Under H.B. 386, women who come to a clinic seeking abortion at 21 weeks, 3 days lmp or later will thus be unable to obtain abortion.

80.     Similarly, women who come to a clinic seeking abortion care shortly before any point at which an abortion procedure becomes more complex, costly, or risky will be pushed into that procedure.  For example, women who come three days before the end of the first trimester will instead have to have a second trimester D&E procedure.  Likewise, women who come to a clinic within three days of the date at which it ceases to offer medication abortion—which is currently FDA-approved until 10 weeks lmp—will be deprived of the choice of medication abortion at that clinic.

81.     Women seeking abortion care after 16 weeks, 3 days lmp will face even further hurdles.  On information and belief, Doe 2 is the only physician in Louisiana providing abortion care after 16 weeks, 6 days.  Thus, H.B. 386 will require Louisiana women seeking abortion after 16 weeks, 3 days to go to Bossier.  The distances from Bossier to the state's two largest metropolitan areas, Baton Rouge and New Orleans, are about 250 miles and about 325 miles, respectively.  Currently, women from these and other areas distant parts of the state typically endure the 24-hour waiting period required under current state law in a local hotel, as two back-to-back round trips of 500-650 miles is neither economical nor practical.  H.B. 386 will now compel many of these women to undergo a longer, multi-day hotel stay, or make this trip twice.  They will have to pay for more travel costs and incidentals.  Some will also incur additional lost income from added time spent away from work, additional child care expenses, and other expenses related to longer time away from home.

82.     Although H.B. 386 contains a provision waiving two of the required three days of delay for women who live more than 150 miles from a licensed abortion clinic, it will do nothing for women traveling from Baton Rouge or New Orleans seeking abortion care at Bossier after 16 weeks, 3 days.  This is because these cities have licensed abortion facilities, but they do not provide care after 16 weeks, 6 days.  Therefore, the exception for women who live more than 150 miles from a clinic would not apply to these women.

### _H.B. 488_

83.     H.B. 488 prohibits any person from providing an abortion unless they are a physician board-certified in obstetrics and gynecology or family medicine, or a resident training under such a physician.

84.     A person violating this section is liable for imprisonment up to two years, a fine of up to one thousand dollars, professional discipline, a wrongful death suit by the patient regardless of whether she sought the abortion, and liability for malpractice regardless of whether malpractice was committed.

85.     No other Louisiana law requires a physician performing any outpatient procedure other than an abortion, or prescribing any medication other than to induce an abortion, to be a board-certified specialist.

86.     H.B. 488 limits, without medical justification, the pool of physicians eligible to perform abortion and thus makes it even more difficult for women to obtain abortion in their own communities.  By extension, it also limits, without medical justification, the pool of physicians the Clinic Plaintiffs may hire to perform abortions.  It thus reduces women's access to abortions in Louisiana by exacerbating the current shortage of physicians providing abortions in Louisiana, and it threatens the ongoing viability of Clinic Plaintiffs, by limiting their ability to replace departing physicians and to hire new ones.

*H.B. 606*

87.     H.B. 606 prohibits any state agency, official, employee, or subdivision from "bestow[ing] any funding upon, an entity or organization that performs abortions, or that contracts with an entity or organization that performs abortions," except for abortions to prevent the death of the patient, in cases of rape or incest, or when the pregnancy is "medically futile."

88.     Therefore, H.B. 606 prohibits both the flow of state funds to entities that offer abortions except in the narrow circumstances outlined above, and the flow of state funds to third-party entities that contract with such abortion providers.

89.     An entity, such as a vendor, that seeks to do business with a state agency or a state subdivision is therefore ineligible to do so if it also contracts with abortion providers, including Plaintiff Clinics.

90.     The entire government of Louisiana, and all local governments in this state, collectively, bestow billions of dollars of business and funding on the private sector each year. They are therefore a many-fold larger potential source of revenue for vendors and others wishing to do business with state or receive state funds, than are the state's four remaining abortion clinics.

91.     H.B. 606 thus forces every entity in the State of Louisiana into the Hobson's choice of being eligible to do business with, or receive funds from, the entire state and local public sector, or to be able to contract with abortion clinics.

92.     Accordingly, it threatens abortion clinics' business relationships with all of their vendors, on whom they depend for a vast array of essential services, from facilities maintenance to the purchase of medication and supplies to the cleaning of soiled medical linen, among many others.

93.     If vendors refuse to contract with abortion clinics, including Plaintiff Clinics, because they wish to remain eligible to service the public sector in Louisiana, all Louisiana's abortion clinics will close, and there will no longer be access to legal abortion in Louisiana.

94.     Prohibiting the state from paying or funding any entity that contracts with any other entity that performs abortions serves no rational state interest.

95.     Additionally, H.B. 606 imposes a legal stigma on abortion clinics, isolating them by singling them out to Louisiana businesses as uniquely unqualified entities with whom to contract.

## THE ACTS' CUMULATIVE IMPACT

### *The regulatory environment in Louisiana*

96.     In addition to the impact of the individual challenged statutes, outlined above, the 2016 Acts cumulatively impose greater burdens on abortion in Louisiana than does each act taken alone.

97.     The 2016 Acts are part of a regulatory system aimed at virtually every conceivable point of obstruction in abortion care delivery in Louisiana, with the expectation and intention that, by closing off as many critical points as possible, abortion clinics will progressively shut down, physicians who currently provide abortion care will become progressively unable to do so, new physicians will find the hurdles to beginning to provide abortion care too great, women will find it increasingly hard to obtain the abortion care they seek, and access to legal abortion in Louisiana will become increasingly unavailable, until it does not exist in practice, while remaining legal in theory.

98.     Parts of this effort to regulate abortion out of existence include laws passed before the 2016 legislative session, which, although not challenged here, form the background against which the 2016 Acts were written, and which together create the most restrictive regulatory scheme in the nation.  Prior to the passage of the 2016 Acts, Louisiana had codified both a statement opposing legalized abortion and a criminal ban on abortion, with a penalty of up to ten years' imprisonment at hard labor, to take effect immediately if *Roe v. Wade* is ever overturned.  Other existing regulations provide that twenty-four hours before an abortion, a woman receive an ultrasound, whether or not medically necessary, a narration of the ultrasound image, and state-written materials designed to discourage abortion, and have a discussion about the abortion with a physician (and not any other licensed healthcare

professional such as a counselor or physician assistant). Physicians who provide abortions are excluded from the protections of the state's malpractice reform law. Health insurance purchased through the state exchange is not allowed to cover abortion. Public funds may not be used to pay for abortion except when a woman's life is in danger or when she has reported being a victim of rape or incest both to law enforcement and to a physician who has certified the report. Discrimination against physicians who provide abortions is legal, but discrimination against physicians who refuse to do so is prohibited. A law passed in 2014, requiring that all physicians performing abortions have active admitting privileges within 30 miles of the abortion facility, has been challenged and is currently preliminarily enjoined. Louisiana House Bill 388, Regular Session (2014) (Act 620), codified at La. Rev. Stat. § 40:1299.35.2 (the "2014 Admitting Privileges Requirement").

99.     Legislators made clear in their debate over the 2016 Acts that their intention was to further regulate abortion until it becomes impossible to perform. Senator John Milkovich, who voted in favor of each of the 2016 Acts, aptly summed up the Legislature's purpose in passing them, stating in debate over H.B. 1019, "we've had about five decisive votes on stopping abortion . . . ."

100.    On or about June 8, 2016, Defendant Attorney General Landry sent an unsolicited letter to every abortion clinic in Louisiana, including the Clinic Plaintiffs. The letter attaches a list of dozens of abortion clinic regulations in the Louisiana Revised Statutes. The list of these regulations alone amounts to three pages. The letter states Defendant Landry's expectation that "your organization will respect and comply with these provisions." It concludes, "[i]n the event your organization fails to observe the law and regulations of the State, legal action may follow." Neither the letter nor the list indicate that many of the

regulations embraced within the list, including the 2014 Admitting Privileges Requirement, are enjoined, and therefore Clinic Plaintiffs are not obligated to "respect and comply with" them.  Upon information and belief, Defendant Landry has not sent letters of this kind to recipients other than abortion clinics.

<em>Obstacles imposed in the path of women seeking abortions</em>

101.    The cumulative impact of H.B. 1081 and H.B. 815, each of which bans a method of abortion, impose a greater burden on women than each act individually.  Together, they would ban the methods of abortion currently chosen by a significant percentage of the women obtaining abortions in Louisiana.  This leaves suction aspiration, which is currently used in somewhat less than two-thirds of abortions, and which is not available after very earlier in the second trimester, as the only commonly-used method of abortion available in Louisiana.

102.    H.B. 386 and H.B. 1081 impose a cumulative impact on women seeking abortion care after about 15 weeks greater than each bill taken individually.  H.B. 1081 prohibits the performance of a D&E—a second trimester procedure—without first performing an additional procedure that, before 18 weeks, is unnecessary, untested, and risky.  The delay imposed by H.B. 386 will force more women into the second trimester who would otherwise have had an abortion in the first.  The result is that some women who would have had an uncomplicated, first trimester procedure will now be forced to undergo an experimental and complicated second trimester one.

103.    H.B. 386 and the physician shortage caused by H.B. 488 (and by the 2014 Admitting Privileges Requirement, should it ever take effect) also impose a cumulative burden on women greater than each act taken individually.  For women seeking abortion

services at Hope Clinic after 13 weeks, 6 days lmp, there is only one physician available, Doe 3.  Pursuant to Defendant LSBME's Advisory Opinion, *see supra* ¶¶ 29-32, Hope's other physician, Doe 1, only offers abortion care up to 13 weeks, 6 days lmp, as he is a family physician and not an ob/gyn.  Doe 3 only works at Hope two days per week, Tuesdays and Thursdays.  Thus, a woman seeking an abortion after 13 weeks, 6 days lmp at Hope is likely to face a longer than 3-day wait to obtain one.  Patients whose first visit falls on a Friday will face a four-day wait, until the following Tuesday.  Patients whose first visit falls on a Tuesday or Thursday will face a five-day wait.  Patients whose first visit falls on a Wednesday will face a six day wait.

104.    Doe 3 cannot increase the number of days he works at Hope because he also has a private ob/gyn practice, through which he is able to keep and maintain his admitting privileges, which he is required to keep by the 2014 Admitting Privileges Requirement. Since the 2014 Admitting Privileges Requirement was signed into law, none of the other abortion providers in the Shreveport area, who unlike Doe 3 do not maintain separate, non-abortion practices, have been able to obtain the required admitting privileges in the area around Shreveport.

105.    Likewise, Hope has been unable to hire physicians to provide coverage on additional days because they have been unable to find willing physicians who satisfy LSBME's criteria and either have admitting privileges or are willing to risk taking a job that they might have to leave if the admitting privileges requirement takes effect, and who, as of August 1, 2016 under H.B. 488, must be board-certified ob/gyns or family physicians.

106.    Similarly, Doe 2 works Tuesdays through Saturdays.  Thus, under H.B. 386, women who go to Bossier, and receive all the information necessary for them to be able to

grant their informed consent on Thursdays and Fridays, would be required to wait four or five days, respectively, before obtaining abortion care.

107.     The impact of these obstacles will be to impose further delay-related risks, anxieties, costs, and suffering on women seeking abortions, than those imposed by H.B. 386 taken alone.

*Impact on the availability of provision of abortion services in Louisiana*

108.     A number of the challenged acts cumulatively threaten the availability of abortion services in Louisiana.

109.     The 2014 Admitting Privileges Requirement and H.B. 488 are focused on restricting the pool of physicians.  Cumulatively, they make it extremely difficult for Plaintiff Clinics, or any facility that offers abortion care, to hire physicians to provide abortions.

110.     It is already difficult for abortion clinics in Louisiana to find physicians willing to provide abortions, due in great part to the fact that the State of Louisiana has made providing this service unreasonably difficult, legally risky, and fundamentally uncertain as a profession, as well as to the climate of harassment and violence around abortion.  The 2014 Admitting Privileges Requirement is an example of this uncertainty, although it has not taken effect, because physicians without local admitting privileges cannot begin an abortion practice unless they are willing to assume the risk that they will have to give it up, should it become effective.  Similarly, former DHH Secretary Kathy Kliebert's decision to deny, in January 2015, a license to an applicant seeking to open an abortion clinic on the basis that it had not shown an adequate need for a new facility, only to unilaterally withdraw the "certificate of need" requirement a few months after applying it, has created uncertainty around the ability to open any new clinics, and to staff them.  H.B. 488 further adds to these difficulties by

requiring physicians (with the exception of residents in training) to be board-certified ob/gyns or family physicians. Together, these provisions limit the pool of health care providers eligible to perform abortions to a tiny fraction of Louisiana health care providers.

111. These provisions greatly complicate clinics' ability to replace departing physicians and hire new ones. Hope Clinic has in the past utilized the services of physicians, trained in providing abortion care, who cannot now provide abortion services under the cumulative requirements of the 2014 Admitting Privileges Requirement and H.B. 488. Hope has been unable to hire additional physicians to provide abortion services for several years. If Louisiana abortion clinics are unable to hire new physicians to replaces physicians who retire or move away, they will be unable to keep their doors open.

112. The impact of physician shortages created by the cumulative effect of the 2014 Admitting Privileges Requirement and H.B. 488 is likely to be particularly severe on access to second trimester abortion care. Not all physicians are trained to provide second trimester abortions, so the limitations imposed by these laws will further diminish an already small pool. Currently, the only clinic offering abortion services after 16 weeks, 6 days lmp is Bossier, where just one physician offers abortion care. Bossier is unlikely to keep its doors open if that doctor has to cease providing services. Its closure would end the provision of abortion care in Louisiana after 16 weeks, 6 days lmp.

113. H.B. 1019 further complicates' clinics ability to retain physicians. By casting a legal cloud over physicians who currently work at abortion clinics unless and until DHH writes its "informational document," H.B. 1019 increases the likelihood that physicians may seek other employment, and thus be unable to return to abortion practice if and when the cloud is removed. Given the physician shortage imposed by the 2014 Admitting Privileges

27

Requirement and H.B. 488, these losses may be irreplaceable, resulting in the clinics' permanent closure.

114.    Finally, as discussed *supra* ¶¶ 87-95, H.B. 606 inhibits clinics' ability to continue providing services by threatening the loss of all their business relationships.

115.    The cumulative impact of these restrictions is to severely threaten the ongoing availability of abortion services in Louisiana sufficient to meet need.  With only five physicians offering abortion services at four clinics, the loss of any further physicians or facilities would create a shortage resulting in lengthy delays and the denial of care to women. This recently occurred when the 2014 Admitting Privileges Requirement briefly took effect between February 24 and March 4 of this year.  During a period of only nine days, when only two doctors were offering abortion care at only two clinics in Louisiana, wait times grew exponentially, and some patients were turned away from clinics.

## **IRREPARABLE INJURY**

### *H.B. 1081*

116.    Plaintiffs' and their patients will suffer irreparable harm from the violation of Plaintiffs' and their patients' constitutional rights if H.B. 1081 goes into effect.

117.    H.B. 1081 will burden the health and safety of women seeking second trimester abortions by forcing them to undergo more complex and risky procedures, including the possibility of having to undergo untested medical procedures, invasive digoxin injections, or inpatient labor and delivery.

### *H.B. 1019*

118.    Plaintiffs and their patients will suffer irreparable harm from the violation of Plaintiffs' and their patients' constitutional rights if H.B. 1019 is enforced.

119. H.B. 1019 may be read as a criminal ban on virtually all abortions, unless and until DHH develops and distributes its "informational document" regarding "fetal genetic abnormality" and "children born with disabilities."

120. H.B. 1019 forces all women obtaining abortions in the state of Louisiana to receive this document even though it is irrelevant for the vast majority of them. Forcing women to receive this irrelevant information could also be confusing, and suggests to women that they are not receiving the individualized, well-informed medical care that they are entitled to in any medical setting. In addition, H.B. 1019 stigmatizes women seeking abortions for reason of genetic abnormality.

121. Additionally, H.B. 1019 bans some women seeking pre-viability abortions at 22 weeks or later on the ground that the Legislature disapproves of their reason for seeking the abortion, thus depriving women of their autonomy and denying them their ability to make decisions as competent adults.

### *H.B. 815 and S.B. 33*

122. Plaintiffs and their patients will suffer irreparable harm from the violation of Plaintiffs' and their patients' constitutional rights if H.B. 815 goes into effect.

123. H.B. 815 bans medication abortion, thus denying women a safe first trimester abortion option, and forcing them to accept a surgical procedure, for no medical reason, and even where medication abortion is medically indicated due to a woman's particular circumstances.

124. H.B. 815 and S.B. 33 irrationally deny women who have had an abortion the ability to donate fetal tissue, and to determine how the remains of their fetus or embryo will be disposed of, while permitting women who have experienced a miscarriage to do so.

125.     H.B. 815 and S.B. 33 stigmatize women who choose abortion by prohibiting them from donating fetal tissue, and from determining how the remains of their fetus or embryo will be disposed of, while permitting women who have experienced a miscarriage to do so.

126.     S.B. 33 also stigmatizes and discriminates against physicians who perform abortions by providing among the harshest legal penalties—decades of imprisonment at hard labor—for disposing of an embryo or fetus in a manner that would be legal if produced through miscarriage.

### *H.B. 386*

127.     Plaintiffs' patients will suffer irreparable harm from the violation of Plaintiffs' patients' constitutional rights if H.B. 386 goes into effect.

128.     H.B. 386 will force women to wait at least three days, and in practice many will be forced to wait more, between the time they have all the information necessary to grant their informed consent to an abortion and the time they are allowed to grant that consent.  By depriving women of a time-sensitive medical procedure at the time to which they are able to consent to it, H.B. 386 deprives women of their autonomy over their persons and of their dignity as patients, with no medical justification.

129.     The delays imposed by H.B. 386 threaten women's health.  The delays also impose numerous burdens on women and their families in the form of unnecessary and unjustified anxiety, suffering, and expense.

### *H.B. 488*

130.     Plaintiffs and their patients will suffer irreparable harm from the violation of Plaintiffs' patients' constitutional rights if H.B. 488 goes into effect.

131.     H.B. 488 greatly limits the pool of physicians able to offer abortion care in Louisiana, and thereby limits Clinic Plaintiffs' ability to hire and retain physicians to provide abortions, with no corresponding health benefit for women seeking abortions.

132.     The number of physicians offering abortion care in Louisiana's abortion clinics is now so low that the loss of even one more physician will result in a deep shortage of abortion care providers in Louisiana.

133.     Reducing the number of such physicians by even one further would result in long waits throughout the state, and the denial of abortion care for some women.

## *H.B. 606*

134.     Plaintiffs and their patients will suffer irreparable harm from the violation of Plaintiffs' and their patients' constitutional rights if H.B. 606 goes into effect.

135.     H.B. 606 forces every business in the State of Louisiana into the Hobson's choice of being eligible to do business with the entire state and local public sector, or with abortion clinics.

136.     Accordingly, it threatens abortion clinics' business relationships with all of its vendors, on whom they depend for a vast array of essential services, from facilities maintenance to the sale of medication and supplies, among many others.

137.     If vendors refuse to contract with abortion clinics, including Plaintiff Clinics, because they wish to remain eligible to work with the public sector in Louisiana, all Louisiana's abortion clinics will close, and there will no longer be access to legal abortion in Louisiana.

138.     Additionally, H.B. 606 irrationally discriminates against Plaintiffs, and stigmatizes the provision of abortion care, by categorizing Plaintiffs as uniquely unqualified for others to do business with in the state of Louisiana.

*The challenged acts, cumulatively*

139.     Together, the 2016 Acts will impose irreparable harm on Plaintiffs and their patients from a violation of their constitutional rights that is greater than the violations imposed by each challenged act taken alone.

140.     Collectively, and in conjunction with what is already among the most restrictive scheme of abortion regulations in the nation, the 2016 Acts impose a web of requirements with which women and abortion clinics cannot hope to comply.

141.     The 2016 Acts create threats to the availability of abortion in practice throughout the state.

142.     They threaten the existence of clinics by further restricting their ability to hire physicians and exacerbating the existing shortage of physicians willing and able to provide abortions.

143.     They threaten the existence of clinics by imposing multiple, overlapping bans on abortions and types of abortion procedures, and imposing expensive and time-consuming burdens on patients, which some may not be able to overcome, or may seek to overcome by going out-of-state, thus reducing the clinics' flow of patients.

144.     They threaten the existence of clinics by threatening to make it impossible for the Clinic Plaintiffs do business with third parties.

145.     The 2016 Acts' collective burden on women seeking abortion is to impose numerous, medically unnecessary restrictions on abortion methods and practices which will

prevent many from obtaining abortion services altogether, reduce the number of procedure options available to them, impose lengthy and costly delays in obtaining abortion care, and increase health risks, suffering, and anxiety.

146.     The 2016 Acts cumulatively discriminate against and stigmatize physicians who offer abortion care and women who seek it, labeling both as uniquely untrustworthy, incapable, and marginalized.

## CLAIMS FOR RELIEF

### COUNT I—H.B. 1081

### (Substantive Due Process—Right to Privacy)

147.     The allegations of paragraphs 1 through 146 are incorporated as though fully set forth herein.

148.     H.B. 1081 violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because it has the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability.

149.     H.B. 1081 violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution by compelling them to undergo an invasive, unnecessary medical procedure.

### COUNT II—H.B. 1081

### (Equal Protection)

150.     The allegations of paragraphs 1 through 149 are incorporated as though fully set forth herein.

151.    H.B. 1081 violates Plaintiffs' patients' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution by compelling women seeking abortions, but no other medical patients, to undergo an invasive, unnecessary medical procedure.

152.    H.B. 1081 violates Plaintiffs' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution by compelling them to perform an invasive, unnecessary medical procedure, against their medical judgment, on pregnant women seeking abortions, but on no other patients.

## COUNT III—H.B. 1019

### (Substantive Due Process—Right to Privacy and Vagueness)

153.    The allegations of paragraphs 1 through 152 are incorporated as though fully set forth herein.

154.    H.B. 1019 violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because it has the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability.

155.    H.B. 1019 violates Plaintiffs' right to liberty and due process as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because it imposes conditions on the performance of legal abortion with which it is impossible to comply.

## COUNT IV—H.B. 815 and S.B. 33

### (Substantive Due Process—Right to Privacy)

156.    The allegations of paragraphs 1 through 155 are incorporated as though fully set forth herein.

157.     H.B. 815 and S.B. 33 violate Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because they have the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability.

## COUNT V—H.B. 815 and S.B. 33

### (Equal Protection)

158.     The allegations of paragraphs 1 through 157 are incorporated as though fully set forth herein.

159.     H.B. 815 and S.B. 33 violate Plaintiffs' patients' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution by prohibiting pregnant women seeking abortions, but no other patients with pregnancy loss, from determining how their fetus or embryo is disposed of, and from donating their fetus or embryo for scientific research.

160.     H.B. 815 and S.B. 33 violate Plaintiffs' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution by irrationally classifying the disposition of their patients' fetuses or embryos lost through abortion differentially from their patients' fetuses or embryos lost through miscarriage.

## COUNT VI—H.B. 386

### (Substantive Due Process—Right to Privacy)

161.     The allegations of paragraphs 1 through 160 are incorporated as though fully set forth herein.

162.     H.B. 386 violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because it has

the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability.

## COUNT VII—H.B. 488

### (Substantive Due Process—Right to Privacy)

163.     The allegations of paragraphs 1 through 162 are incorporated as though fully set forth herein.

164.     H.B. 488 violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because it has the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability.

## COUNT VIII—H.B. 606

### (Substantive Due Process—Right to Privacy)

165.     The allegations of paragraphs 1 through 164 are incorporated as though fully set forth herein.

166.     H.B. 606 violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because it has the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability.

## COUNT IX—H.B. 606

### (Equal Protection)

167.     The allegations of paragraphs 1 through 166 are incorporated as though fully set forth herein.

168.     H.B. 606 violates Plaintiffs' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution by irrationally imposing discriminatory impediments on their ability to contract with third parties.

### COUNT X—The 2016 Acts

### (Substantive Due Process—Right to Privacy)

169.     The allegations of paragraphs 1 through 168 are incorporated as though fully set forth herein.

170.     The 2016 Acts cumulatively violate Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution because they have the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability.

WHEREFORE, Plaintiffs respectfully request that the Court:

1. declare the 2016 Acts, individually and cumulatively, unconstitutional under the Fourteenth Amendment to the United States Constitution;

2. without bond, enjoin Defendants, their employees, agents, and successors in office from enforcing the 2016 Acts, individually and cumulatively;

3. award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

4. grant Plaintiffs such other, further, and different relief as the Court may deem just and proper.

Respectfully submitted this 1st day of July, 2016.

/s/ William E. Rittenberg
William E. Rittenberg
Louisiana State Bar No. 11287
RITTENBERG, SAMUEL AND PHILLIPS, LLC

715 Girod St.
New Orleans, LA 70130-3505
(504) 524-5555
rittenberg@rittenbergsamuel.com

Janet Crepps*
David Brown*
Zoe Levine*
Molly Duane*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St., 22nd Floor
New York, NY 10038
(864) 962-8519
jcrepps@reprorights.org

David Scannell*
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006-1888
(202) 887-1500
dscannell@mofo.com

*Attorneys for Plaintiffs June Medical Services LLC
d/b/a Hope Medical Group for Women, Bossier City
Medical Suite, John Doe 1, M.D., John Doe 2,
M.D., and John Doe 3, M.D.*

*A*dmission pro hac vice pending*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 1st day of July, 2016, a copy of the foregoing Complaint, and all of its attachments and exhibits, is being served upon all counsel in person via process server and overnight mail to the following parties:


REBEKAH GEE
Secretary of the Louisiana Department of Health and Hospitals
Louisiana Department of Health
628 N. 4th Street
Baton Rouge, LA 70802
Fax: 225-342-5568

JEFF LANDRY
Office of the Louisiana Attorney General
1885 N. Third Street
Baton Rouge, LA 70802
Fax: 225-326-6096

J. MICHAEL BURDINE, MD
Louisiana State Board of Medical Examiners
630 Camp Street
New Orleans, LA 70130
Fax: 504-568-5754

JAMES E. STEWART, SR.
Caddo Parish District Attorney's Office
501 Texas St., 5th floor
Shreveport, LA 71101
Fax: 318-226-6878

J. SCHUYLER MARVIN
Bossier Parish District Attorney's Office
204 Burt Blvd
Benton, LA 71006
Fax: 318-965-2233


/s/ *Janet Crepps*