# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

JUNE MEDICAL SERVICES LLC,
ET AL.

CIVIL ACTION

VERSUS

REBEKAH GEE, ET AL.

NO.: 16-00444-BAJ-RLB

## RULING AND ORDER

Pursuant to the Court's Scheduling Order (Doc. 21), Defendants were permitted to file three separate motions to dismiss that addressed distinct sets of issues relating to the Louisiana Legislature's 2016 regulations on abortion. Before the Court are Defendants' **First Motion for Partial Dismissal RE: H.B. 606, H.B. 1019, and H.B. 488 (Doc 27); Second Motion for Partial Dismissal RE: S.B. 33, H.B. 815, and H.B. 38 (Doc. 40);** and **Third Motion for Partial Dismissal RE: H.B. 1081 and Cumulative Impact Claim (Doc. 58)**. Defendants seek dismissal of Plaintiffs' claims that challenge certain laws enacted by the Louisiana Legislature during the 2016 Regular Legislative Session that place restrictions on abortion providers, patients, doctors, state and local government agencies, as well as private businesses that contract with the state. Plaintiffs in this suit are June Medical Services, LLC ("Clinic Plaintiff"),[1] which brings suit on behalf of its patients, physicians, and staff, and Drs. John Doe 1, John Doe 2, and John Doe 3 ("Doctor Plaintiffs"), who bring suit individually and on behalf of their patients. (Doc. 22 at

---

[1] The Court dismissed Plaintiff Bossier City Medical Suite when it ceased operating as a licensed abortion clinic. (*See* Docs. 45, 46).

pp. 1–2). Plaintiffs filed memoranda in opposition to the Motions, (*see* Docs. 38, 47, 63), and Defendants filed reply memoranda in support of the Motions, (*see* Docs. 39, 65). The Court conducted hearings on June 16, 2017, and October 2, 2017. (*See* Docs. 60, 79). For the reasons that follow, Defendants' Motions are **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

During the 2016 Regular Legislative Session, the Louisiana Legislature enacted several laws that address the provision of abortion services within the state: House Bill 606, enacted as Act 304 ("H.B. 606"); House Bill 1019, enacted as Act 563 ("H.B. 1019"); House Bill 488, enacted as Act 98 ("H.B. 488"); Senate Bill 33, enacted as Act 196 ("S.B. 33"); House Bill 815, enacted as Act 593 ("H.B. 815"); House Bill 386, enacted as Act 97 ("H.B. 386"); and House Bill 1081, enacted as Act 264 ("H.B. 1081"). Plaintiffs challenge the legislation both individually and collectively.

### A. H.B. 606

H.B. 606 prohibits any "institution, board, commission, department, agency, official, or employee of the state, or of any local political subdivision thereof," from "contract[ing] with, award[ing] any grant to, or otherwise bestow[ing] any funding upon, an entity or organization that performs abortions, or that contracts with an entity or organization that performs abortions, in th[e] state." (Doc. 22-7 at p. 2, ll. 17–20; *id.* at p. 3, l. 1). This prohibition applies "to state funds, federal funds, and any other funds that may be used for purposes of contracting for services, providing reimbursements, or grant issuance." (*Id.* at p. 3, ll. 2–3). The statute specifically

provides that this prohibition "shall not be construed to restrict funding to an entity that may perform the following types of abortions, *exclusively*": (1) "[a]n abortion [that] is medically necessary to prevent the death of the mother," (2) "[a]n abortion in a case when the mother is a victim of rape or incest," or (3) "[a]n abortion performed when the pregnancy is diagnosed as medically futile." (*Id.* at p. 3, ll. 4–10) (emphasis added).

Clinic Plaintiff alleges that H.B. 606 "threatens abortion clinics' contracts with government entities," as well as "their business relationships with all of their vendors" because H.B. 606 "forces every entity in the State of Louisiana into the Hobson's choice of being eligible [either] to do business with, or receive funds from, the entire state and local public sector . . . or . . . to contract with abortion clinics." (Doc. 22 at ¶¶ 107–08). Setting aside the effects that Clinic Plaintiff alleges will result from H.B. 606's prohibition of awarding state contracts to entities that contract with abortion providers, Clinic Plaintiff asserts that H.B. 606 facially prohibits it from "contracting for essential services" from government entities. (*Id.* at ¶ 110). According to Clinic Plaintiff, the effect of H.B. 606 will be that "all [of] Louisiana's abortion clinics will close," thereby depriving women in Louisiana of "access to legal abortion" in the State. (*Id.* at ¶ 109). Additionally, Clinic Plaintiff alleges that "H.B. 606 imposes a legal stigma on abortion clinics, isolating them by singling them out to Louisiana businesses as uniquely unqualified entities with whom to contract." (*Id.* at ¶ 111).

**B.     H.B. 1019**

H.B. 1019 makes it unlawful "for any person to intentionally perform or attempt to perform an abortion of an unborn child of twenty or more weeks post-fertilization age" when that person has "knowledge that the pregnant woman is seeking the abortion solely because the unborn child has been diagnosed with either a genetic abnormality or a potential for a genetic abnormality." (Doc. 22-2 at p. 3, ll. 10–15). Further, the statute requires that all women seeking an abortion first be provided an informational document regarding fetal genetic abnormalities:  H.B. 1019 makes it unlawful

> for a person to intentionally perform or attempt to perform an abortion of an unborn child of less than twenty weeks post-fertilization age without first providing the pregnant woman with an informational document including resources, programs, and services for pregnant women who have a diagnosis of fetal genetic abnormality and resources, programs, and services for infants and children born with disabilities.

(*Id.* at p. 3, ll. 16–21). The statute directs the Louisiana Department of Health and Hospitals ("DHH") to develop this informational document. Pursuant to the statute, neither of these provisions shall apply "whenever the abortion is nescssary [sic] to save the life of the mother." (*Id.* at p. 4, ll. 3–4).

Plaintiffs challenge both the ban and the informational document. (Doc. 22 at ¶¶ 172–74). In reference to the prohibition on abortions performed after the fetus has reached a gestational age of twenty weeks when a physician has reason to believe that the woman is seeking the abortion due to actual or potential genetic abnormalities of the fetus, Plaintiffs allege that H.B. 1019 "criminalizes pre-viability abortion based solely on the reason [that] the woman is seeking the abortion." (*Id.* at

¶ 63). Regarding the requirement that all women seeking an abortion be given an informational document containing information about fetal genetic abnormalities, Plaintiffs assert that "[f]or the great majority of women seeking abortions, who have not had a diagnosis of fetal genetic abnormality, or whose pregnancy is medically futile, this information is irrelevant to their decision." (*Id.* at ¶ 71).

## C.   H.B. 488

Pursuant to H.B. 488, in order to lawfully perform an abortion in the State of Louisiana, a physician must be "board-certified in obstetrics and gynecology or family medicine or enrolled in a residency program for obstetrics and gynecology or family medicine." (Doc. 22-6 at p. 2, ll. 12–14). If the physician is "enrolled in a residency program for obstetrics and gynecology or family medicine," then that physician must be "under the direct supervision of a physician who is board-certified in obstetrics and gynecology or family medicine." (*Id.* at p. 2, ll. 13–16). *Direct supervision*, for purposes of the statute, means that "the physician must be present in the hospital, on the campus, or in the outpatient facility, and immediately available to furnish assistance and direction throughout the performance of the procedure," but "[t]he physician need not be present in the room when the procedure is performed in order to maintain direct supervision." (*Id.* at p. 3, ll. 4–8). Under prior law, a physician could perform an abortion as long as he or she had "enrolled in or ha[d] completed a residency . . . in obstetrics and gynecology or family medicine"; board certification in those disciplines was not required. (*Id.* at p. 2, ll. 12–13).

Plaintiffs allege that "H.B. 488 limits, without medical justification, the pool of physicians eligible to perform abortion and thus makes it even more difficult for women to obtain abortion[s] in their own communities." (Doc. 22 at ¶ 102). Additionally, Plaintiffs assert that H.B. 488 "also limits, without medical justification, the pool of physicians the Clinic Plaintiff[] may hire to perform abortions." (*Id.*). According to Plaintiffs, H.B. 488 "reduces women's access to abortions in Louisiana by exacerbating the current shortage of physicians providing abortions in Louisiana, and it threatens the ongoing viability of Clinic Plaintiff[] by limiting [its] ability to replace departing physicians and to hire new ones." (*Id.*).

**D.    S.B. 33**

S.B. 33 prohibits any person from "knowingly and for money[—]including but not limited to fees for storage or handling, any payments for reimbursement, repayments, or compensation, or any other consideration[—][b]uy[ing], sell[ing], receiv[ing], or otherwise transfer[ing] or acquir[ing] a fetal organ or body part resulting from an induced abortion [or] [t]ransport[ing] with the intent to sell or otherwise transfer a fetal organ or body part resulting from an induced abortion." (Doc. 22-4 at p. 2, ll. 10–16). The provision also makes it unlawful for any person to "[t]ransport a fetal organ or body part resulting from an induced abortion that has been acquired by any person via any [of the previously described] transaction[s]." (*Id.* at p. 2, ll. 17–18).

Plaintiffs allege that "S.B. 33 prohibit[s] women who choose abortion from consenting to the donation of their fetal tissue for scientific research," (Doc. 22 at

¶ 87), which "stigmatize[s]" them because the provision does not prohibit "women who have experienced a miscarriage" from donating their fetal tissue, (*Id.* at ¶ 143). Plaintiffs similarly aver that "S.B. 33 . . . stigmatizes and discriminates against physicians who perform abortions by providing among the harshest legal penalties— decades of imprisonment at hard labor—for disposing of an embryo or fetus in a manner that would be legal if produced through miscarriage." (*Id.* at ¶ 144).

### E.    H.B. 815

H.B. 815 requires "[e]ach physician who performs or induces an abortion [that] does not result in a live birth [to] insure that the remains of the child are disposed of . . . by interment or cremation." (Doc. 22-3 at p. 2, ll. 15–16, 18). The regulation that implements this provision requires a physician, prior to performing an abortion, "orally and in writing [to] inform the pregnant woman seeking an abortion . . . that the pregnant woman has . . . the option to make arrangements for the disposition and/or disposal of fetal remains by interment or cremation . . . or . . . the option to have the outpatient abortion facility/physician make the arrangements for the disposition and/or disposal of fetal remains by interment or cremation." La. Admin. Code tit. 48, § 4431(8)(b). Additionally, H.B. 815 makes it unlawful "for any person or entity to buy, sell, donate, accept, distribute, or otherwise transfer or use for any purpose the intact body of a human embryo or fetus whose death was knowingly caused by an induced abortion, or the human organs, tissues, or cells obtained from a human embryo or fetus whose death was knowingly caused by an induced abortion." (Doc. 22-3 at p. 4, ll. 8–12).

Regarding the requirement that fetal remains be interred or cremated, Plaintiffs assert that H.B. 815 "on its face, bans medication abortion, a commonly used method of abortion in the first trimester, and the only one allowing a woman to pass a pregnancy at home, because an embryo miscarried at home through medication abortion cannot in practice be interred or cremated." (Doc. 22 at ¶ 6). Plaintiffs further allege that H.B. 815's prohibition on the sale, donation, acceptance, distribution, or transfer of fetal remains "irrationally den[ies] women who have had an abortion the ability to donate fetal tissue, and to determine how embryonic or fetal tissue will be disposed of, while permitting women who have experienced a miscarriage to do so," (*id.* at ¶ 142), thereby "stigmatiz[ing]" those women, (*id.* at ¶ 143).

F.     **H.B. 386**

In essence, H.B. 386 increases—from twenty-four to seventy-two hours—the period of time that must elapse between a patient's receipt of various information and documents and a physician's performance of an abortion procedure on the patient ("waiting period"). (*See, e.g.*, Doc. 22-5 at p. 5, l. 22). "If the pregnant woman certifies in writing that she currently lives one[-]hundred[-]fifty miles or more from the nearest licensed outpatient abortion facility to her residence," however, she must adhere to a twenty-four-hour waiting period. (*Id.* at p. 5, ll. 11–13). Plaintiffs allege that by increasing the waiting period from twenty-four to seventy-two hours, H.B. 386 "[d]elays . . . abortion care, . . . expos[ing] women to greater health risks

associated with later abortions and longer pregnancies . . . and increase[ing] anxiety, suffering, and expense." (Doc. 22 at ¶ 93).

### G.  H.B. 1081

H.B. 1081 makes it unlawful for "any person to intentionally perform or attempt to perform a dismemberment abortion and thereby kill an unborn child unless necessary to prevent serious health risk to the unborn child's mother." (Doc. 22-1 at p. 4, ll. 16–18). The provision graphically defines "dismemberment abortion" as any procedure in which a physician, "with the purpose of causing the death of an unborn child, . . . purposely dismember[s] a living unborn child and extract[s] him or her one piece at a time from the uterus through use of clamps, grasping forceps, tongs, scissors, or a similar instrument that, through the convergence of two rigid levers, slices, crushes, or grasps a portion of the unborn child's body to cut or rip it off or apart." (*Id.* at p. 3, ll. 16–21).

Plaintiffs allege that H.B. 1081 prohibits "dilation and evacuation (["]D & E["]) procedures[2] without [fetal] demise, thus denying Louisiana women seeking second trimester abortions a safe and commonly used method, and requiring them to undergo an additional risky and invasive procedure." (Doc. 22 at ¶ 5). The ban that H.B. 1081 places on D & E procedures, according to Plaintiffs, "effectively depriv[es] women of access to abortion in Louisiana after about 15 weeks from their last menstrual period." (*Id.*).

---

[2] The D&E procedure is the most common second-trimester method of abortion and involves the "use forceps or other instruments to remove the products of conception (including the fetus, placenta, and umbilical cord) from the uterus, often in combination with suction." (Doc. 22 at ¶ 31).

## H.    Cumulative Impact

The laws passed during the 2016 Regular Legislative Session are just the latest in the Louisiana Legislature's aggressive regulation of abortion.  Plaintiffs contend that the State's goal is a "regulatory system aimed at virtually every conceivable point of obstruction in abortion care delivery in Louisiana" with the intention that "access to legal abortion in Louisiana will become increasingly unavailable, until it does not exist in practice, while remaining legal in theory." (*Id.* at ¶ 113).  Therefore, Plaintiffs argue that the Court should consider the impacts of H.B. 606, H.B. 1019, H.B. 488, S.B. 33, H.B. 815, and H.B. 386, not individually, but collectively.  (*See id.* at ¶ 159). According to Plaintiffs, the cumulative impact of the 2016 regulations "is greater than the [constitutional] violations imposed by each challenged restriction taken alone." (*Id.* at ¶ 158).

## II.    LEGAL STANDARD

### A.    Lack of Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(1), a claim is "'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). In order to "prevent[] a court without jurisdiction from prematurely dismissing a case with prejudice," a court should consider a Rule 12(b)(1) motion for lack of subject-matter jurisdiction before addressing any motions that concern the merits of a case. *Id.* at 286–87 (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). A motion to dismiss under Rule 12(b)(1) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6). *Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992).

Article III of the United States Constitution grants federal courts the subject matter jurisdiction "to decide only actual cases or controversies." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714–15 (5th Cir. 2012) (citing U.S. Const. art. III, § 2). "The justiciability doctrines of standing, mootness, political question, and ripeness 'all originate in Article III's "case" or "controversy" language.'" *Id.* at 715 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "To establish standing, a plaintiff must prove that (1) he has sustained an 'injury in fact' that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical,' (2) there is 'a causal connection between the injury and the conduct

complained of,' and (3) a favorable decision is likely to redress the injury." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 454 (5th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The injury-in-fact element requires that a plaintiff show that he or she 'has sustained or *is immediately in danger of sustaining* some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)) (internal quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur." *Planned* Parenthood *of Gulf Coast, Inc.*, 862 F.3d at 454 (quoting *Susan B. Anthony List v. Driehaus*, ___ U.S. ___, 134 S. Ct. 2334, 2341 (2014)). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges," however, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish," *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984) *abrogated on other grounds by Lexmark Int'l Inc. v. Static Control Components, Inc.* ___ U.S. ___, 134 S. Ct. 1377 (2014)), because "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" *id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (Kennedy, J.)).

A related, but distinct, issue of justiciability is ripeness. To determine whether a claim is ripe, the court must "balance '(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration.'" *Planned Parenthood of Gulf Coast, Inc.*, 862 F.3d at 456 (quoting *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007)). When only legal questions remain, a case is generally considered ripe for adjudication. *Id.* "[E]ven where an issue presents purely legal questions," however, "the plaintiff must show some hardship in order to establish ripeness." *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000). "The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'" *Texas*, 497 F.3d at 499 (quoting *Oh. Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998)).

## B.    Failure to State a Claim

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Hines v. Alldredge*, 783 F.3d 197, 200–01 (5th Cir. 2015) (quoting *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)). Even so, a complaint must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining

whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Although the complaint need not set out "detailed factual allegations," it must set forth something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Plaintiffs challenge the legislation on substantive due process and equal protection grounds.

### 1. Substantive Due Process

Under the United States Constitution, women have a long-established right "to choose to have an abortion before viability and to obtain it without undue interference from the State." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992) (affirming the essential holding of *Roe v. Wade*, 410 U.S. 113 (1973)). An undue burden "exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Gonzales v. Carhart (Carhart II)*, 550 U.S. 124, 146 (2007) (quoting *Casey*, 505 U.S. at 878). This is true even if the State is seeking to further a legitimate governmental interest in assuring that abortions are performed safely. *See Whole Woman's Health v. Hellerstedt*, ___ U.S. ___, 136 S. Ct. 2292, 2309 (2016). "The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* Accordingly, at the motion to dismiss stage, Plaintiffs must plausibly plead that the Government regulation has the purpose or effect of creating an undue burden on a woman's right

to seek an abortion prior to the fetus obtaining viability. *See Carhart II*, 550 U.S. at 146.

### 2. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "To establish an equal protection claim, [Plaintiffs] must show that two or more classifications of similarly situated persons [are] treated differently." *Gallegos–Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) (per curiam). When a state law treats those who provide or receive abortions differently than others similarly situated, Plaintiffs bear the burden of demonstrating that the Government regulation is not rationally related to a legitimate government interest. *See K.P. v. LeBlanc*, 729 F.3d 427, 440 (5th Cir. 2013); *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001).

## III. DISCUSSION

Whenever a litigant asserts that his or her constitutional rights have been violated, the Court reviews such claims with the utmost seriousness. In all three of their motions, however, Defendants argue that Plaintiffs' challenges to each of the state laws should be dismissed for lack of justiciability and alternatively for failure to state a claim. The Court addresses both Rule 12(b) motions together because they are analyzed under the same standard. *See Benton*, 960 F.2d at 21.

## C.     H.B. 606

### 1.     *Direct Injury*

Clinic Plaintiff alleges that H.B. 606 injures it by "prohibiting [it] from contracting for essential services" with state or local government entities, (Doc. 22 at ¶ 110), and "threaten[ing] . . . [its] business relationships with all of [its] vendors, on whom [it] depend[s] for a vast array of essential services," (*id.* at ¶ 108).

Additionally, Clinic Plaintiff argues that the clear wording of the law prohibits them from contracting with *any* governmental entity, including those that provide essential services, such as water and sewage. According to Clinic Plaintiff, H.B. 606 prohibits even these contracts for essential services, which are only provided by government entities and cannot be obtained through other means. As a result, Clinic Plaintiff asserts that any healthcare provider that offers abortion services will be forced to close because of the lack of essential services, and abortion services would thus be unavailable in the State of Louisiana.

Regarding its business relationships with its vendors, Clinic Plaintiff alleges that H.B. 606 "forces every entity in the State of Louisiana into the Hobson's choice of being eligible to do business with, or receive funds from, the entire state and local public sector . . . or to be able to contract with abortion clinics." (*Id.* at ¶ 107). "The entire government of Louisiana, and all local governments in th[e] state," according to Clinic Plaintiff, "bestow billions of dollars of business and funding on the private sector each year," and therefore vendors will invariably elect to cease doing business with healthcare providers that offer abortion services because state and local

government entities are a "many-fold larger potential source of revenues for vendors and others wishing to business in the state or receive state funds . . . than are the state's four remaining abortion clinics." (*Id.* at ¶ 106).

Defendants point out that Clinic Plaintiff has not alleged that it has been unable to contract for essential services with any state or local government entity, nor has Clinic Plaintiff alleged that any of its current business relationships with vendors have been negatively impacted by H.B. 606.

Clinic Plaintiff has neither pleaded nor argued that H.B. 606 *actually* prohibits it from contracting for essential services with government entities or caused any of Clinic Plaintiff's vendors to cease doing business with in. Clinic Plaintiff's alleged injuries, therefore, are *future* injuries, but those injuries are not "conjectural or hypothetical" in nature and therefore confer standing upon Plaintiffs. *Roark*, 522 F.3d at 542 (quoting *Lyons*, 461 U.S. at 102). Clinic Plaintiff asserts that its interpretation of H.B. 606—that the legislation prohibits government entities from providing essential services to healthcare providers that offer abortion service—is dictated by the clear wording of the statute. Defendants, through the declaration of Defendant Rebekah Gee, aver that DHH interprets H.B. 606 as "solely . . . restrict[ing] payments of public funds to a limited class of entities." (Doc. 39-1 at ¶ 7). DHH does not interpret H.B. 606 as "prohibit[ing] any entity from obtaining government services, including but not limited to water and sewage," (*id.*), and no government entity in Louisiana interprets H.B. 606 in such a way, (*id.* at ¶ 8). However, Gee's interpretation is not binding on state courts or other state and local

entities that could plausibly interpret the legislation more broadly; therefore, Gee's interpretation does not defeat Clinic Plaintiff's standing to challenge H.B. 606. *See Sternberg v. Carhart (Carhart I)*, 530 U.S. 914, 940–41 (holding that a court need not accept a state official's interpretation of a law when the official has no authority to bind state courts or other state officials).

Additionally, at this stage, Clinic Plaintiff has sufficiently pleaded that H.B. 606 imposes an unconstitutional condition. (*See* Doc 22 at ¶ 187). It is well established that states may indicate their preference for childbirth over abortion and that states have no duty to fund or promote abortions. *See Maher v. Roe*, 432 U.S. 474–76 (1977); *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 351 (5th Cir. 2012). H.B. 606 sweeps far broader, however, prohibiting entities that perform abortions and entities that contract with abortion providers from accessing "state funds, federal funds, and any other funds that may be used for purposes of contracting for services, providing reimbursements, or grant issuance," even when the funds are not used to provide abortions. (Doc. 22-7 at p. 3, ll. 2–3).

Although the unconstitutional conditions doctrine has traditionally applied to First Amendment claims, the Supreme Court has made clear that the doctrine applies to rights outside the first amendment context. *See Koontz v. St. Johns River Water Mgmt. Dist.*, ___ U.S. ___, 133 S. Ct. 2586, 2594 (2013) ("[T]he unconstitutional conditions doctrine . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."); *accord Planned Parenthood of Sw. & Cent. Fla. v. Philip*, 194 F. Supp. 3d 1213, 1216–17

(N.D. Fla. 2016) (applying the unconstitutional conditions doctrine to a statute that prohibits abortion providers from receiving state funds for services unrelated to abortion). Women have a constitutional right "to choose to have an abortion before viability." *Casey*, 505 U.S. at 846. Although the State is not required to actively support that right, Clinic Plaintiff has plausibly pleaded that the state cannot condition the receipt of *any* funds or *any* contract with the state on Clinic Plaintiff's exercise of that continually protected right. Because the state cannot directly prohibit Clinic Plaintiff from exercising its right to provide abortions, the unconstitutional conditions doctrine is implicated. *See Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 437 (5th Cir. 2014) ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972))). Therefore, Clinic Plaintiff has standing to challenge H.B. 606 to the extent the legislation prohibits it from accessing government funds or services unrelated to abortion.

However, any threatened injury to Clinic Plaintiff's business relationships with its vendors is too "conjectural or hypothetical" in nature to confer standing. *Roark,* 522 F.3d at 542 (quoting *Lyons,* 461 U.S. at 102). Clinic Plaintiff, in the First Amended Complaint, pleads that H.B. 606 merely *"threatens"* its "business relationships with all of [its] vendors." (Doc. 22 at ¶ 108 (emphasis added)). The

basis for its assertion that H.B. 606 threatens its business relationships with its vendors is *itself* speculative in nature: Clinic Plaintiff merely pleads that its vendors will invariably choose to be eligible to receive state funding and state contracts, rather than continue to do business with Clinic Plaintiff, due to the "many-fold larger potential source of revenue" that state contracts present. (*Id.* at ¶ 106). Clinic Plaintiff does not plead, however, that any of its vendors have made such a choice or have indicated that they will make such a choice to cease doing business with Clinic Plaintiff. It therefore has not demonstrated that the threatened injury is "certainly impending" or that there is a "substantial risk that the harm will occur." *Planned Parenthood of Gulf Coast, Inc.*, 862 F.3d at 454 (quoting *Susan B. Anthony List*, 134 S. Ct. at 2341). The Court's finding that Clinic Plaintiff lacks standing to challenge H.B. 606 with respect to its vendors is buttressed by the fact that this provision of H.B. 606 does not regulate the conduct of Plaintiffs themselves, but rather the conduct of third parties that are not before the Court. *See Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (quoting *Allen*, 468 U.S. at 758)).

## 2. *Stigmatic Injury*

Stigmatic injury caused by a government action "accords a basis for standing . . . to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen*, 468 U.S. at 755. To establish that it has suffered a stigmatic injury, Clinic Plaintiff must identify "some concrete interest with

respect to which [it] [is] personally subject to discriminatory treatment." *Id.* at 757 n.22. "That interest must independently satisfy the causation requirement of standing doctrine." *Id.*; *see also Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir. 2017), *appeal docketed*, No. 17-23 (U.S. June 30, 2017) ("[T]o plead stigmatic-injury standing, [Clinic] Plaintiff must plead that [it] was personally subjected to discriminatory treatment.").

Clinic Plaintiff has identified a concrete interest that it alleges amounts to a stigma: H.B. 606 "singl[es] [abortion providers] out to Louisiana businesses as uniquely unqualified entities with whom to contract." (Doc. 22 at ¶ 111). Because the objects of the regulation that H.B. 606 effectuates are "Louisiana businesses," entities who are not parties to this suit, the Court must determine whether the alleged stigma in this case is caused by H.B. 606 itself or other motivations that these third parties who are not before the Court might possess. *See Planned Parenthood of Gulf Coast, Inc.*, 862 F.3d at 456 ("Although injury resulting from 'the *independent* action of some third party not before the court' will not suffice, 'that does not exclude injury produced by determinative or coercive effect upon the action of someone else.'" (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997))). At a minimum, to establish standing for its stigmatic injury claim, Clinic Plaintiff would have to plead that Louisiana businesses have or will refuse to contract with it because of H.B. 606 or that it was denied equal treatment in some other way, not just that it was subjected to anti-abortion messaging. *See Moore*, 853 F.3d at 249.

D.    H.B. 1019

   1.    *Prohibition on Abortions Performed After the Fetus Has Reached a Gestational Age of Twenty Weeks when a Physician Has Reason to Believe that the Woman Is Seeking the Abortion Due to the Actual or Potential Genetic Abnormalities of the Fetus*

Among the three elements that a plaintiff must show to establish her standing is that "a favorable decision is likely to redress the [alleged] injury." *Planned Parenthood of Gulf Coast*, 862 F.3d at 454. "[A] plaintiff satisfies the redressability requirement when [s]he shows that a favorable decision will relieve a discrete injury to h[er]self. [Sh]e need not show that a favorable decision will relieve h[er] every injury." *K.P.*, 627 F.3d 115, 123 (5th Cir. 2010) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

Plaintiffs allege, as a discrete injury, that H.B. 1019's prohibition on abortions performed after the fetus has reached a gestational age of twenty weeks when a physician has reason to believe that the woman is seeking the abortion due to the actual or potential genetic abnormalities of the fetus "criminalizes pre-viability abortion based solely on the reason [that] the woman is seeking the abortion." (Doc. 22 at ¶ 63). Another Louisiana statute, however, criminalizes *all* abortions performed after the fetus has reached a gestational age of twenty weeks, regardless of a woman's motivation for seeking an abortion. *See* La. Rev. Stat. § 1061.1(E)(1). Even if the Court were to strike down this portion of H.B. 1019 as unconstitutional, Louisiana Revised Statutes section 1061.1(E)(1)—which Plaintiffs do not challenge in this suit—would continue to criminalize precisely the same conduct. Plaintiffs thus do

not have standing to challenge this portion of H.B. 1019 because a favorable decision by this Court would not redress Plaintiffs' alleged injury.[3] *See Planned Parenthood of Gulf Coast*, 862 F.3d at 454.

### 2. *Informational Document Containing Information about Fetal Genetic Abnormalities*

Defendants argue that Plaintiffs' challenge to H.B. 1019's requirement that physicians disclose to each woman seeking an abortion an informational document addressing fetal genetic abnormalities is not ripe for review because the informational document has yet to be promulgated. Plaintiffs retort that their challenge to H.B. 1019's mandated disclosure of the informational document is not based on the "content of the document, but rather the fact that all women must receive irrelevant information [regarding fetal genetic abnormalities] *in the first place.*" (Doc. 38 at p. 18 (emphasis added)). Therefore, according to Plaintiffs, their claim is ripe because it can be evaluated by the Court without viewing the actual document that must be disclosed to women seeking abortions. (*Id*).

The Court finds that Plaintiffs have adequately pleaded that their claim turns on the purely legal question of whether an informational document that contains information about fetal genetic abnormalities is "relevant" and therefore permissible. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 576 (5th Cir 2012) ("[I]nformed consent laws that do not impose an undue burden on the

---

[3] Plaintiffs appear to have abandoned this claim. (*See* Doc. 38 at p. 16 n.15) ("Plaintiffs do not oppose dismissal of their claim that H.B. 1019 impermissibly bans pre-viability abortions sought for reason of genetic abnormality . . . but note that that assertion remains relevant to Plaintiffs' cumulative undue burden claim.")

woman's right to have an abortion are permissible if they require truthful, nonmisleading, and *relevant* disclosures." (emphasis added)). The content of the informational document is not speculative. To the contrary, H.B. 1019 explicitly requires the informational document to include "resources, programs, and services for pregnant women who have a diagnosis of fetal genetic abnormality and resources, programs, and services for infants and children born with disabilities." (Doc. 22-2 at p. 3, ll. 16–21).

Regardless, Defendants argue that Plaintiffs will not suffer harm because, under state regulations, Plaintiffs do not have to provide the informational document until thirty days following its promulgation. *See* La. Admin. Code tit. 48. § 4431(G)(4)(d). Defendant James E. Stewart, Sr., the district attorney who has jurisdiction over Clinic Plaintiff, has also indicated that he does not intend to enforce the mandatory disclosure requirements of H.B. 1019 nor seek the relevant criminal penalties for noncompliance until thirty days following the promulgation of the informational document. (*See* Doc. 61-1 at ¶ 5).

Although the informational document has yet to be promulgated, Plaintiffs have adequately pleaded that they will be harmed by the law. Importantly, Defendants do not claim that the State may decline to promulgate the document required by H.B. 1019, nor do they claim that they may not enforce the law after the thirty-day grace period ends. The hardship required for ripeness can be met by the creation of a legal obligation. *See Texas*, 497 F.3d at 499. It is of no moment that the informational document has yet to be promulgated and that enforcement will be

delayed following its promulgation. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect."). For these reasons, Plaintiffs' claim that the content of the informational document is irrelevant to a woman's informed consent before obtaining an abortion is ripe for review.

E.  **H.B. 488**

1.  *Standing of Physician Plaintiffs*

In order to establish her standing to bring suit, a plaintiff must demonstrate that "(1) [s]he has sustained an 'injury in fact' that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical.'" *Planned Parenthood of Gulf Coast*, 862 F.3d at 454 (quoting *Lujan*, 504 U.S. at 560–61).

H.B. 488 limits the class of physicians who may lawfully perform abortions in the State of Louisiana to physicians who are either "board-certified in obstetrics and gynecology or family medicine" or "enrolled in a residency program for obstetrics and gynecology or family medicine" and are "under the direct supervision of a physician who is board-certified in obstetrics and gynecology or family medicine." (Doc. 22-6 at p. 2, ll. 12-16). Under previous law, a physician could lawfully perform an abortion as long as he or she merely had "enrolled in or ha[d] completed a residency . . . in obstetrics and gynecology or family medicine." (*Id.* at p. 2, ll. 12-13).

All of the Physician Plaintiffs are either board-certified in obstetrics and gynecology or family medicine, (*see* Doc. 22 at ¶¶ 22–24), and thus H.B. 488 does not preclude any of them from continuing to perform abortions in Louisiana. Physician Plaintiffs therefore have suffered no "injury-in-fact" as a result of H.B. 488, and the Physician Plaintiffs thus lack standing to challenge H.B. 488. *See Planned Parenthood of Gulf Coast*, 862 F.3d at 454 (quoting *Lujan*, 504 U.S. at 560–61).

### 2. *Clinic Plaintiff and Claims Brought on Behalf of Patient Plaintiffs*

As stated previously, "[t]he injury-in-fact element requires that a plaintiff show that he or she 'has sustained or *is immediately in danger of sustaining* some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.'" *Roark*, 522 F.3d at 542 (quoting *Lyons*, 461 U.S. at 102) (internal citations and quotations omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur." *Id.* (quoting *Susan B. Anthony List*, 134 S. Ct. at 2341). Moreover, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish," *Lujan*, 504 U.S. at 562 (quoting *Allen*, 468 U.S. at 758), because "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" *id.* (quoting *ASARCO*, 490 U.S. at 615 (Kennedy, J.)). Thus, when a plaintiff is not the

object of the challenged government action, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.*

Plaintiffs allege that H.B. 488 "limits, without medical justification, the pool of physicians eligible to perform abortion and thus makes it even more difficult for women to obtain abortion in their own communities." (Doc. 22 at ¶ 102). Additionally, Plaintiffs assert that H.B. 488 "also limits, without medical justification, the pool of physicians the . . . Plaintiffs [that operate clinics] may hire to perform abortions," thereby "reduc[ing] women's access to abortions in Louisiana by exacerbating the current shortage of physicians providing abortions in Louisiana . . . and . . . threaten[ing] the ongoing viability of [the] Plaintiffs [that operate clinics] by limiting their ability to replace departing physicians and to hire new ones." (*Id.*). In essence, Plaintiffs aver that "[i]f Louisiana abortion clinics are unable to hire new physicians who retire or move away, they will be unable to keep their doors open," and H.B. 488 inhibits their ability to remain open because it unduly restricts the pool of physicians whom the clinics may hire. (Doc. 22 at ¶ 127).

Plaintiffs have thus alleged a *future* injury that will result from H.B. 488—that the legislation will render it more difficult for Clinic Plaintiff to replace its current physicians when they "retire or move away." (*Id.*). This injury is "not conjectural or hypothetical," however, because one of Physician Plaintiffs, Doctor Doe 3, is "nearing retirement age" and suffers from a "serious health issue." *See Roark*, 522 F.3d at 542 (quoting *Lyons*, 461 U.S. at 102); (Doc. 38 at p. 22). Doctor Doe 3's

health issue has recently rendered him "unable to provide abortion services for several weeks," (Doc. 38 at p. 22), and Plaintiffs have pleaded that because the number of physicians who provide abortion services in Louisiana is "so low," the unavailability of even one of the current physicians who provide abortion services in Louisiana "result[s] in a deep shortage of abortion care providers in Louisiana," (Doc. 22 at ¶ 150), "long waits throughout the state, and the denial of abortion care for some women," (*id.* at ¶ 151). Because of Doctor Doe 3's health issue and his impending retirement, Clinic Plaintiff "has concrete plans to hire an additional physician" due to the dire consequences to its ability to provide abortions when Doctor Doe 3 is unavailable. (Doc. 38 at p. 22). As a result of Clinic Plaintiff's concrete intention to hire a physician to serve as a replacement for Doctor Doe 3, "there is a substantial risk" that the alleged injury—that H.B. 488 renders it more difficult to find that replacement physician—will occur. *Roark*, 522 F.3d at 542 (quoting *Susan B. Anthony List*, 134 S. Ct. at 2341); *cf. Lujan*, 504 U.S. at 564 ("'[S]ome day' intentions— without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

The Court finds that this injury—the increased difficulty in hiring additional physicians (*see* Doc. 22 at ¶ 102)—confers standing to Clinic Plaintiff. Plaintiffs, in their Amended Complaint, plead that H.B. 488 creates an additional hurdle for Clinic Plaintiff in its search for a replacement physician for Doctor Doe 3. (*Id.*). Whatever other challenges Clinic Plaintiff faces in hiring a replacement for Doctor Doe 3, the

discreet injury that H.B. 488 causes can be redressed by a favorable ruling. In other words, a favorable ruling may not eliminate all difficulties Clinic Plaintiff faces in hiring a replacement doctor, but it can eliminate the additional difficulty Clinic Plaintiff faces under H.B. 488. Given the fact-intensive inquiry required in the abortion context, *see Hellerstedt* at 136 S. Ct. at 2309, Clinic Plaintiff has sufficiently pleaded that the law will create an undue burden.

F. **S.B. 33**

As stated previously, "[t]he injury-in-fact element requires that a plaintiff show that he or she 'has sustained or *is immediately in danger of sustaining* some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.'" *Roark*, 522 F.3d at 542 (quoting *Lyons*, 461 U.S. at 102). Defendants first argue that Plaintiffs have failed to demonstrate an injury in fact because Plaintiffs have not pleaded "that [Plaintiffs] or their patients are paid to transfer aborted human fetal remains now, or otherwise do anything that S[.]B[.] 33 prohibits." (Doc. 40-1 at pp. 3–5).

At this stage, Plaintiffs have not shown the required injury in fact to confer standing because Plaintiffs have not alleged that they engage in or would engage in the conduct prohibited by S.B. 33. Similarly, regarding Plaintiffs' stigmatic injury claim, this Court notes that in order to establish that they have suffered a stigmatic injury, Plaintiffs must identify "some concrete interest with respect to which [they] are personally subject to discriminatory treatment." *Allen*, 468 at 757 n.22; *see also*

*Moore*, 853 F.3d at 250 ("[T]he gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging."). Plaintiffs have not alleged that they presently or in the future plan to donate fetal tissue and seek to recuperate expenses associated with that donation; therefore, Plaintiffs have not been personally subjected to discriminatory treatment. That is not to say that Plaintiffs could never plead that S.B. 33 violates their Due Process or Equal Protection rights, only that at this point in time, Plaintiffs have failed to do so.

### G.    H.B. 815

#### 1.    *Burial or Cremation*

H.B. 815 requires "[e]ach physician who performs or induces an abortion [that] does not result in a live birth [to] insure that the remains of the child are disposed of . . . by interment or cremation." (Doc. 22-3 at p. 2, ll. 15–16, 18). Plaintiffs allege that this portion of H.B. 815 creates an undue burden in two respects.

First, Plaintiffs allege that this provision "on its face, bans medication abortion, a commonly used method of abortion in the first trimester, and the only one allowing a woman to pass a pregnancy at home, because an embryo miscarried at home through medication abortion cannot in practice be interred or cremated." (Doc. 22 at ¶ 6). Defendants assert that Plaintiffs' claim that the provision has the effect of outlawing medication abortions, in which the fetus is expelled outside a medical setting and is disposed of by the mother, is belied by the emergency regulation that implements this provision. (Doc. 40-1 at p. 13). That emergency regulation provides interpretive clarity that the internment-or-cremation requirement "shall not apply to

abortions induced by the administration of medications when the evacuation of any human remains occurs at a later time and not in the presence of the inducing physician or at the facility in which the physician administered the inducing medications." (Doc. 40-1 at p. 13 (quoting La. Admin Code tit. 16, § 102(B))).

Second, Plaintiffs allege that H.B. 815 "stigmatizes women seeking abortion . . . treats women seeking abortions differently than women experiencing miscarriages, and forces women seeking abortions to accept the State's view as to fetal personhood. (Doc. 47 at p. 3). Plaintiffs argue that although the state may express its preference for childbirth over abortion, it cannot infringe "on the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." Casey, 505 U.S. at 851; *cf. Margaret S. v. Edwards*, 488 F. Supp. 181, 222–23 (E.D. La. 1980) (striking down a Louisiana law requiring doctors to ask women seeking abortions whether they want their fetuses to be buried or cremated because "[s]uch a question equates the abortion process with the taking of a human life" and creates psychological burdens on pregnant women); *but see Carhart II*, 550 U.S. at 157 (holding that the State may "use its voice and its regulatory authority to show its profound respect for the life within the woman"). Defendants insist that Plaintiffs must plead *facts* indicating that the State's expression of a perspective *actually* burdens abortion as a practical matter. (Doc. 40-1 at p. 15).

The Court finds that Plaintiffs have standing and have alleged that H.B. 815 places an undue burden on a woman's right to terminate a pregnancy prior to the fetus obtaining viability. Regarding the claim that H.B. 815 effectively bans medication abortions, such a claim is a purely legal issue that is ripe for adjudication. *See Planned Parenthood of Gulf Coast, Inc.*, 862 F.3d at 455. Moreover, Plaintiffs have alleged that the law places them in the position of being "force[d] . . . to modify [their] behavior in order to avoid future adverse consequences." *See Texas*, 497 F. 3d at 499 (quoting *Sierra Club*, 523 U.S. at 734).

The State's emergency regulation does not affect the ripeness of the claim. In some ways, the regulation is broader than the statute, creating even greater confusion among the Plaintiffs about how to comply with the state rules. (*See* Doc. 47 at p. 4). Additionally, the regulation does not bind all state actors empowered to impose discipline against Plaintiffs under H.B. 815, such as the state board of medical examiners. (*See* Doc. 22 at ¶ 79); La. Rev. Stat. § 40:1061.29. Therefore, the Court is not obligated to defer to the regulation's interpretation of the statute. *See Carhart I*, 530 U.S. at 940–41 (cautioning against accepting an interpretation of a statute where that interpretation is not binding on all state officials).

The Court will also allow Plaintiffs' equal protection claim regarding fetal burial or cremation to go forward. Plaintiffs have alleged that the statute treats women who have abortions differently than women who experience miscarriages. (Doc. 22 at ¶ 84). Therefore, Plaintiffs have sufficiently pleaded that their patients

are singled out from women who are similarly situated.[4]  *Moore*, 853 F.3d at 250 ("[T]he gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging.").

## 2. Donation of Fetal Tissue

Additionally, H.B. 815 makes it unlawful "for any person or entity to buy, sell, donate, accept, distribute, or otherwise transfer or use for any purpose the intact body of a human embryo or fetus whose death was knowingly caused by an induced abortion, or the human organs, tissues, or cells obtained from a human embryo or fetus whose death was knowingly caused by an induced abortion." (Doc. 22-3 at p. 4, ll. 8–12).

For reasons similar to those regarding S.B. 33, however, Plaintiffs do not have standing to challenge the donation portion of H.B. 815 because they have not alleged that they donate or have planned to donate fetal tissue from an induced abortion. Therefore, any injury is "conjectural or hypothetical" and does not confer standing. *Roark*, 522 F.3d at 542 (quoting *Lyons*, 461 U.S. at 102); *see also Allen*, 468 at 757 n.22 (holding that Plaintiffs must identify "some concrete interest with respect to which [they] are personally subject to discriminatory treatment").

## H. H.B. 386

H.B. 386 increases the waiting period for abortions from twenty-four to seventy-two hours. (*See, e.g.*, Doc. 22-5 at p. 5, l. 22). "If the pregnant woman certifies

---

[4] The medical term for miscarriage is spontaneous abortion.  Kristyn S. Appleby & Joanne Tarver, *Medical Records Review* § 3.32(1) (2010).

in writing that she currently lives one[-]hundred[-]fifty miles or more from the nearest licensed outpatient abortion facility to her residence," however, a twenty-four hour waiting period still applies. (*Id.* at p. 5, ll. 11–13).

Defendant's primary contention is that increasing the waiting period from twenty-four to seventy-two hours for an abortion does not create an undue burden because *Casey* upheld a waiting period for an abortion; therefore, the law is not facially invalid. (Doc. 40-1 at pp. 16–17). Defendants also offer a more subtle argument: because Plaintiffs cite substantially the same harms that Plaintiffs in *Casey* did, Plaintiffs cannot invalidate a waiting period based on the same harms alleged in *Casey*. (*Id.* at pp. 17–18).

The Court finds that at this stage of the litigation, Plaintiffs have adequately pleaded that increasing the waiting period from twenty-four to seventy-two hours places an undue burden on patients seeking abortions. Plaintiffs claim that the waiting period will be longer than three days in many cases, create logistical difficulties, force women to incur greater health risks, and narrow the window in which a woman can seek an abortion. (Doc. 22 at ¶¶ 93–98, 119, 122, 136). As the litigation advances, the Court will "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309. Plaintiffs have sufficiently pleaded that the law imposes an undue burden; thus, the claim survives a motion to dismiss.

## I.    H.B. 1081

H.B. 1081 prohibits D & E procedures without fetal demise, "thus denying Louisiana women seeking second trimester abortions a safe and commonly used method, and requiring them to undergo an additional risky and invasive procedure." (Doc. 22 at ¶ 5). The ban that H.B. 1081 places on D & E procedures, according to Plaintiffs, "effectively depriv[es] women of access to abortion in Louisiana after about 15 weeks from their last menstrual period." (*Id.*).

In *Carhart II*, 550 U.S. 124, the Court upheld a congressional ban on *intact* D & E (i.e., partial birth abortion), which is a specific variation of the D & E procedure. The Court noted that D & E is the "most common second-trimester method," and the Attorney General "d[id] not dispute that the Act would impose an undue burden if it covered standard D&E." *Id.* at 147. In *Carhart I*, 530 U.S. 914, the Court held that a statute, which could be interpreted to criminalize the standard D&E procedure, imposed an "undue burden" upon a woman's right to choose to have an abortion because the standard D&E procedure is the "most commonly used method for performing previability second trimester abortions." 530 U.S. at 945–46.

Here, the State has not conceded that a ban on D & E abortions would impose an undue burden, and the State advocates alternative methods of abortion that would serve as an adequate substitute for D & E abortions. (*See* Doc. 58 at pp. 3–4). Plaintiffs allege that these alternative methods pose an unnecessary risk and deviate from the accepted standard of care. (Doc. 22 at ¶¶ 51–58). Therefore, the Court must examine "the availability of other abortion procedures that are considered to be safe

alternatives." *Carhart II*, 550 U.S. at 166–67; *see also Hellerstedt*, 136 S. Ct. at 2309 (requiring a court to weigh the benefits of a restriction on abortion against its burdens). Considering the fact-intensive nature of this inquiry, the Court finds that Plaintiffs have sufficiently pleaded that a ban on D & E abortions could impose an undue burden.

Additionally, Plaintiffs claim that H.B. 1081 violates the equal protection rights of patients seeking abortion by requiring them—but no other medical patients—"to undergo an invasive, unnecessary medical procedure." (Doc. 22 at ¶ 170). At this early stage, the Court will allow Plaintiffs' equal protection claim to proceed, even though Plaintiffs will face a steep burden of demonstrating that the regulation is not rationally related to a legitimate government interest. *See K.P.*, 729 F.3d at 440.

### J. Cumulative Impact

Plaintiffs argue that the Court should consider the impacts of H.B. 606, H.B. 1019, H.B. 488, S.B. 33, H.B. 815, and H.B. 386, not individually, but collectively. (*See* Doc. 22 at ¶ 159). According to Plaintiffs, the cumulative impact of the 2016 regulations "is greater than the [constitutional] violations imposed by each challenged restriction taken alone." (Doc. 22 at ¶ 158). Although no case explicitly addresses the cumulative impact analysis in the abortion context, courts have regularly considered the cumulative impact of restrictions on other constitutional rights. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (Eighth Amendment); *Murdock v. Pennsylvania*, 319 U.S. 105, 115 (1943) (First Amendment); *Miller v. Carson*, 563

F.2d 741, 746 n.6 (5th Cir. 1977) (substantive due process and Eighth Amendment).
Moreover, *Hellerstedt* implies that the Court should consider how abortion
regulations interact with one another when examining whether regulations impose
an undue burden. *See* 136 S. Ct. at 2306–07 (examining the combined impact of the
"two provisions" at issue on Texas's abortion clinics). In *Hellerstedt*, the Supreme
Court also approvingly cited the district court's analysis and application of "the
correct legal standard." *Id.* at 2310. The district court considered "the cumulative
results" of the two bills at issue. *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 637,
682 (W.D. Tex. 2014), *aff'd in part, vacated in part, rev'd in part sub nom. Whole
Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015), *rev'd sub nom. Whole Woman's
Health v. Hellerstedt,* ___ U.S. ___,136 S. Ct. 2292 (2016).

 The Court agrees with Plaintiffs that when weighing the benefits of a
restriction on abortion against its burdens, *see Hellerstedt*, 136 S. Ct. at 2309, the
Court is not obligated to look at each restriction in isolation. However, the cumulative
impact claim cannot provide the court with jurisdiction over claims it would not have
jurisdiction to consider independently. Therefore, Plaintiffs may advance their
arguments regarding the cumulative effects of the regulations but only with respect
to those claims that the Court has not dismissed.

## IV. CONCLUSION

 Accordingly,

 **IT IS ORDERED** that Defendants' **First Motion for Partial Dismissal
(Doc 27)** is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims challenging H.B. 606 as it applies to third-party contractors are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims challenging H.B. 1019's ban on abortions after twenty weeks when based on genetic abnormalities are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Doctor Plaintiffs' claims challenging H.B. 488 are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERD** that Defendants' **Second Motion for Partial Dismissal (Doc. 40)** is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims challenging S.B. 33 are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims challenging H.B. 815's ban on donating fetal tissue are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURHTER ORDERED** that Defendant's **Third Motion for Partial Dismissal (Doc. 58)** is **DENIED**.

Baton Rouge, Louisiana, this _15th_ day of November, 2017.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**